Scoeibld, J.,
delivered the opinion of the court:
April 12, .1879, the claimant contracted to carry the mail on route lío. 40101, between Prescott, Ariz., and Santa Fé, N. Mex., a distance of 460 miles, three tirn'es a week, from April, 14, 1879, to June 30, 1882, at an annual compensation of $18,600.
After the claimant had -entered upon the performance of his contract the number of trips was enlarged, the running time diminished, and other changes made in the service, whereby the annual compensation on March 24, 1881, amounted to $105,401.76.
On that date the' service ceased. At whose instance it ceased constitutes the main question in this suit. If it was arbitrarily discontinued by the Postmaster-General the claimant is entitled to one month’s extra pay as liquidated damages •, but if voluntarily abandoned by himself he is not only not entitled to claim damages, but he and his sureties are liable for damages to the Government.
The determination of this pivotal question requires an examination of the affairs between the parties as they existed March 24, 1881.
Many complaints of the manner in which the service was *270 being performed reached the Department through official channels. Fines had been imposed and deductions made from time to time, amounting in all to $20,305.53. These had all been remitted prior to said date except $9,171.02, which still stood charged against the contractor. On that day there was due him for services $24,195.38, less said $9,171.02.
The disagreement between the parties began with the following order:
“ (No. 2720.)
“ Maech 22, 1881.
“From March 24, 1881, curtail service so as to end at Fort Wingate, decreasing the distance 150 miles, and deduct from contractor’s pay $38,005.43 per annum, being pro rata, and it being reported that the contractor has failed upon the remainder of the route, the question of one mouth’s extra pay upon the discontinued portion is reserved for future consideration.”
This was followed by Order No. 1389, dated Aprils 16, 1881, suspending pay from January 1, 1881.
Then came a conference between JEL. D. Lyman, chief clerk in the Post-Office Department, which occurred May-18, 1881. In that conference the claimant did not pretend that he had performed any service after the latter part of March, nor that • he had been prevented from performing such service by any order of the Department, but earnestly requested that he should not be declared a failing contractor. They finally came to the understanding that the claimant should be paid up to March 22, and to avoid declaring him a failing contractor the service should not be relet, but taken off altogether, and he should waive in writing all claim for further compensation.
In pursuance of this- understanding the following order was made by the Postmaster-General:
“(No. 5395.)
“ Mat 18, 1881. '
“ From March 22, 1881, discontinue service without allowing contractor one month’s extra pay, the service having been abandoned.
“ (On the margin :) Amended June 11, 1881.”
But the order to suspend payment was not then revoked. Nothing further was done until about June 9, 1881, when said Lyman and claimant had a second conference. They then came *271 to an understanding that the time of service should be enlarged to March 24,1881; that the claimant’s pay should be reckoned up to that date; that he should not claim anything for service he might har e performed after that date; that this should be a complete settlement of the case, and he should file in the Department a written release to that effect.
Thereafter the order suspending payment was revoked, the pay reckoned up to March 24, amounting to $24,195.38, and after subtracting $9,171.02, the amount of fines and deductions not yet remitted, a warrant, dated June 14, 1881, was drawn for the balance.
June 10, 1881, claimant filed in the Department the following paper:
“WASHINGTON, June 10, 1881.
“ E. A. Elmee, Esq.,
“ 2d AshH P. M. Gr. ;
“ Dear Sie : I hereby waive claim to pay for service performed on route 40101 after March 24th, ’81.
“ Bespectfully, y’rs,
“ J. A. Walsh.”
Thereafter the Postmaster-General made the following order:
“ (No. 7073.)
“June 11, 1881.
“ Amend order bearing date May 18,1881 (No. 5395), so as to take effect March 24, 1881, instead of March 22, 1881.”
July 18,1881, the remaining fines and deductions, amounting to $9,171.02, were remitted, and a warrant drawn for the payment to the claimant.
When the conference of May 18 took place the Postmaster-General had suspended pay from January 1, but had not yet declared the service abandoned nor the contract annulled. That question was still under consideration. The claimant did not then pretend that he had performed any service after, the last of March, and only claimed pay to March 22. If he had not voluntarily abandoned the service nearly two months before, why did he not then assert his right to pay for a longer period % Thus he admitted that he had ceased to carry the mail, and did not claim that he had received any permission to do so from the Department except for the 150 miles. He could not excuse his neglect by alleging that his pay had been suspended, *272 for that had not been done until April 1G, 25 days after he had voluntarily quit the service. It is true that he subsequently claimed some few days more, and the time of service ■was enlarged to March 24, but that only strengthened his admission that he had voluntarily abandoned the service before the end of March.
It is very clear that oil the 310 miles thus abandoned by the claimant he was not entitled to damages, because he alone was in fault. No release was necessary to bar this part of the claim.
It is said that the order of May 18 is contradictory and meaningless, inasmuch as it declares the service both discontinued and abandoned at the same time; but in the light of the May conference its meaning becomes clear. It declares the service ababandoned, because it was iu fact abaudoued and had been so for more than fifty days. It declares it discontinued, because it was understood that it should not be revived and relet at the expense of the claimant.
The claim for a month’s extra pay on the ISO miles stands on a different footing altogether. On the 22d of March the Department ordered that the service on that part of the route should be discontinued on the 24th. The order was obeyed. The extra pay was suspended to ascertain whether the contractor had, before that date, “failed on the remainder of the route.” That he had not so failed on the 22d and did not so tail until after the 24th is now admitted.
Did he thereby forfeit the extra pay? We think not. The service on the one part was complete before, or at least simultaneously with, the failure ou the other. The extra pay as liquidated damages might have been withheld and set off against unliquidated damages caused by the failure; but no such damages appear to have been incurred or claimed. The contract does not expressly provide for such forfeiture. On the contrary, it provides that “in case of decrease, curtailment, or discontinuance of service, as a full indemnity of said contractor, one month’s extra pay on the amount of service dispensed with” shall be allowed. Had a contrary construction been placed upon the contract by the Postmaster-General, according to the uniform and long-continued practice of the Department in similar cases, it would have met with respectful *273 consideration and possible concurrence here; but no such departmental construction appears in the case.
Did the claimant in either of the two conferences with Mr. Lyman agree to release this part of his claim ?
In the May conference, according' to Mr. Lyman’s testimony, it was “decided to discontinue the service from March 22, with the understanding that that was to settle his case; that there was to be no claim whatever.” It was agreed that the claimant should file a written release in accordance with this understanding. No release, however, was at that time filed.
In the June conference, according to Mr. Lyman’s testimony, the claimant said: “If we would modify the order and give him two days’ additional pay, he would not claim anything further for the service he might have 'performed, after that date; and he further told me that that should be a complete settlement of the case, and that that should end it.” The release of his claim was to be put in writing.
Supposing this to be a valid contract, it is not entirely clear that the claimant intended to agree to release the extra pay on the 150 miles. He alleged in the conference that he had performed some service after the 24th of March, but, as a compromise, he agreed to settle as of that date. He certainly agreed to release all claim “for the service he might have performed after that date.” So much was definitely specified, and nothing else was. Still, the language employed is general and broad enough to embrace all that is claimed by the defendants. It was, however, agreed that the release should be put in writing. An oral agreement, which is to be reduced to writing, is not complete until the writing is executed. A written release was executed and filed June 10, 1881, but it only “waives the claim for services performed.” So far as the claimant knew, the Department accepted this paper, as a fulfillment, on his part, of the understanding at the conferences. After it was filed, to-wit, June 11,1881, an order was made in the Department enlarging the time of service to March 24,1881, the compensation, reckoned up to that date, and soon after paid.
Criticisms and consultations upon the release between officers, in the Department, of which the claimant had no notice, cannot affect him. Under the circumstances it must be considered that the release was either drawn according to the agreement or was at least accepted by the Department.
*274 The court holds that the claimant is entitled to recover one month’s extra pay on 150 miles of the route and nothing on the remainder.
Judgment will be entered in favor of the claimant in the sum • of $3,167.11.